JAMES A. KOPCKE (SBN 88567)
GOLDEN · KOPCKE, LLP
22 Battery Street, Suite 610
San Francisco, CA 94111
Tel:(415) 399-9995; Fax:(415) 398-5890

RICHARD J. ARCHER, ESQ (SBN 20720)
ARCHER & HANSON
3110 Bohemian Highway
Occidental, CA 95465
Tel:(707) 874-3438; Fax:(707) 874-3438

Attorneys for Plaintiffs SHERI L. KENDALL, dba BALA HAIR SALON,
JAMES MASER, MAIZ HOLDING COMPANY, dba PICANTE COCINA
RESTAURANT, on Behalf of Themselves and All Others Similarly
Situated

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SHERI L. KENDALL, dba BALA HAIR SALON, JAMES MASER, MAIZ HOLDING COMPANY, dba PICANTE COCINA RESTAURANT, on Behalf of Themselves and All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>VISA U.S.A. INC., MASTERCARD INTERNATIONAL, INC., BANK OF AMERICA, N.A., a subsidiary of BANK OF AMERICA CORPORATION, WELLS FARGO BANK, N.A., a subsidiary of WELLS FARGO & COMPANY, U.S. BANK, N.A, a subsidiary of U.S. BANCORP,<br><br>        Defendants. | Case No.  C 04 4276 JSW<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**<br><br>**Date: March 18, 2005**<br>**Time: 9:00 a.m.**<br>**Courtroom 17**<br><br>**The Honorable Jeffrey S. White** |

# TABLE OF CONTENTS

I

INTRODUCTION ................................................................................ 1

II

*U.S. v. Visa* FOUND THAT VISA AND MASTERCARD SET MERCHANT DISCOUNTS WHICH DEFENDANT BANKS, AMONG OTHERS, CHARGE THEIR MERCHANT CUSTOMERS ............................................................... 2

III

THE BANKS VIOLATE SECTION ONE IN THEIR INDIVIDUAL CAPACITIES BY PARTICIPATING IN THE OWNERSHIP AND MANAGEMENT OF THE ASSOCIATIONS AND APPLYING THE FIXED MERCHANT DISCOUNTS IN ACCEPTING DEPOSITS ........................................................................ 9

IV

PLAINTIFFS' CLAIM FOR EQUITABLE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT SHOULD NOT BE DISMISSED ................................... 12

V

CONCLUSION ................................................................................. 13

i

# TABLE OF CITED AUTHORITIES

**FEDERAL CASES:**

*AD/SAT v. Associated Press*
181 F. 3d 216 (2d Cir. 1999) ................................................................ 11

*Catalano v. Target Sales*
446 U.S. 643 (1980) ........................................................................ 14

*City of Atlanta v. Chattanooga Foundry and Pipe Works*
127 Fed. 23 (6th Cir. 1903), aff'd. 203 U.S. 390 (1906)..................... 16

*Freeman v. San Diego Association of Realtors*
322 F. 3d 1133 (9th Cir. 2003) ................................................ 11, 12 - 14

*Monsanto Co. v. Spray-Rite Service Corp.*
465 U.S. 752 (1984) ......................................................................... 9

*Nat'l Bancard Corp. v. Visa U.S.A. Inc.*
779 F. 2d 592 (11th Cir. 1986) ..................................... 1, 5, 8, 13

*Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.*
259 F. Supp. 2d 992 (N.D. Cal. 2003) ............ 1, 2, 8, 9, 12, 14, 15

*State of Washington v. American Pipe & Construction Co.*
280 F. Supp. 802 (W.D. Wash. 1968) .................................... 17

*Texas Industries, Inc. v. Radcliff Materials, Inc.*
451 U.S. 630 (1981) ................................................................. 15, 16

*U.S. v. Visa U.S.A. Inc.*
163 F. Supp. 2d 322 (S.D.N.Y. 2001) ................... 1 - 6, 9, 11, 10

*U.S. v. Visa U.S.A. Inc.*
344 F. 3d 229 (2nd Cir. 2003) ........................................ 7, 8, 10

*USM Corp. v. SPS Technologies, Inc.*
694 F. 2d 870 (7th Cir. 1982) ............................................. 14

*Zenith Radio Corp. v. Hazeltine Research*
395 U.S. 100 (1969) ......................................................... 13

*Zoslaw v. MCA Distrib. Corp.*
693 F. 2d 870 (9th Cir. 1982) ............................................ 14

ii

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

C 04 4276 JSW

**FEDERAL STATUTES:**

Federal Rules of Civil Procedure, Rule 12(b)(6) ........................................ 1

The Clayton Act ........................................................................................ 12

15 U.S.C. § 15(a)...................................................................................... 13

15 U.S.C. § 26 .......................................................................................... 12

**OTHER SOURCES**

Baxter, "Bank Interchange of Transactional Paper: Legal and Economic Perspectives", *The Journal of Law and Economics*, vol. XXVI (Oct. 1983), p. 541 ........................................................................ 16

Evans and Schmalensee, *Paying with Plastic* ........................................ 6, 13

Mishkin, *The Economics of Money, Banking and Financial Markets* 6th ed Update, 2003) ............................................................................ 17

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

C 04 4276 JSW

## I.   INTRODUCTION

Defendants Wells Fargo Bank, N.A., Bank of America, N.A. and U.S. Bank N.A. ("Defendant Banks") jointly move to dismiss this action under Rule 12(b)(6) stating that, "the Court never definitively addressed plaintiffs' pleading deficiencies [in *Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.* 259 F. Supp. 2d 992 (N.D. Cal. 2003)] as they related to Defendant Banks." Memo. 1. In doing so they ignore the Court's tentative ruling in *Reyn's* denying Wells Fargo's motion to dismiss which asked, "At the initial pleadings stage, why is it not sufficient to claim that Wells Fargo has a "proprietary interest in" and "participates in the management of" the bankcard networks to state a claim against Wells Fargo individually?"

More important, Defendant Banks assert that the setting of interchange fees was "previously adjudged to be necessary and entirely lawful under the rule of reason," citing *Nat'l Bancard Corp. v. Visa U.S.A. Inc.,* 779 F.2d 592 (11th Cir. 1986) (Memo. 1.), ignoring completely this Court's discussion in *Reyn's* under the rubric: "NaBanco is Not Controlling."

Most important they neither cite (along with failing to cite *Reyn's*) nor discuss *U.S. v. Visa U.S.A. Inc.* 163 F. Supp. 2d 322 (S.D.N.Y. 2001); affirmed, 344 F. 3d 229 (2nd Cir. 2003); certiorari den. __U.S.__ (2004).  As will be shown, *U.S. v. Visa*

1

demonstrates that the facts, and therefore the law, of *NaBanco* no longer apply to Visa and MasterCard.  Also, Defendant Banks ignore the pleading changes from *Reyn's* to this case.

## II.  *U.S. v. Visa* FOUND THAT VISA AND MASTERCARD SET MERCHANT DISCOUNTS WHICH DEFENDANT BANKS, AMONG OTHERS, CHARGE THEIR MERCHANT CUSTOMERS

This issue is important because in *Reyn's* the court stated: "Plaintiffs have not alleged an agreement directly setting the fees they pay, but only allege that the agreed-upon interchange fee largely determines, or 'provides a floor' for the merchant discount" (*Reyn's*, 259 F. Supp. 2d 1000) and concluded that the defendants' conduct should be analyzed under the rule of reason. The *Reyn's* court relied on *NaBanco* to find that the purpose of the interchange fee was to compensate the issuing bank for bearing the risk of nonpayment by the cardholder and other costs. *Reyn's*, 259 F. Supp. 2d 996-7.  The trial court in *NaBanco* found that the interchange fee was determined by a "cost reimbursement methodology" developed in conjunction with Arthur Anderson & Co. *NaBanco*, 596 F. Supp. 1239.  Those were the days when credit cards used manually created charge slips.

Fifteen years after *NaBanco*, Judge Jones found in *U.S. v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D. N.Y. 2001); affirmed 344 F. 3d 229 (2nd Cir. 2003); certiorari den. __ U.S. __ (2004):

p. 332, n. 4.  The issuer pays the acquirer; the acquirer in turn pays the merchant, retaining a small percentage of the purchase price as a fee for its services, which fee it then shares with the issuer. [The portion not shared is clearly a price fixed directly.]

p. 332.  In a Visa or MasterCard credit card purchase the merchant actually receives only about 98 per cent of the price of the item. The remaining  2 per cent is called the "merchant discount," which is the fee paid to the merchant's acquiring bank for providing its services.  The acquirer, in turn, splits this fee with the card-issuing bank, which is paid about 1.4 percent of the purchase price.  The issuing bank owns the consumer's account and takes the payment risk.  The 1.4 percent of the purchase price is called the "interchange fee" and is set by the associations. [The use of percentages to establish the share to the acquiring bank and the methodology used to establish the interchange fee establishes that at least the .6 percent retained by the acquiring bank is directly established by the associations.]

3

p. 337.   In setting interchange rates paid by merchants to issuers (through the merchants' acquiring banks), both Visa and MasterCard consider, and have considered, primarily each others' interchange rates, and secondarily the merchant discount rates charged by Discover and American Express.  [No mention of *NaBanco's* "cost reimbursement methodology".  Note how the court points out that the associations set the rates paid by the merchants "through the merchants' acquiring banks."]

p. 338.   ... and the merchant discount rate is established, directly or indirectly, by the networks.

p. 341.   In addition, both Visa and MasterCard have recently raised interchange rates charged to merchants a number of times, without losing a single merchant customer as a result.  [Neither Visa nor MasterCard can accept merchant deposits; so this can only refer to the merchant customers of the member banks.]

p. 340.   Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards.  [This methodology is

not mentioned in *NaBanco*.  This methodology necessarily assumes that each bank accepting bank card deposits charges at least the network established interchange fee.]

p. 341.  The reality is that Visa and MasterCard are able to charge substantially different prices for those hundreds of merchants who must take credit cards at any price because their customers insist on using those cards.  [This necessarily assumes that each bank accepting deposits charges at least the network established interchange fee.]

p. 342.  Because Visa and MasterCard have large shares in a highly concentrated market with significant barriers to entry, both defendants have market power in the general purpose card network services market, whether measured jointly or separately; furthermore plaintiff has demonstrated that both Visa and MasterCard have raised prices and restricted output without losing merchant customers.  [In *NaBanco* the court concluded that the relevant product market was all payment devices and that Visa did not have market power. *NaBanco*, 779 F. 2d 603.]

p. 388.  To raise its merchant acceptance rate, American Express has lowered its merchant discount rate.

p. 389.  Discover has already lowered its merchant discount rate to gain acceptance.

p. 396. ... merchants – and ultimately consumers – have an interest in the vigor of competition to ensure that interchange pricing points are established competitively.

p. 396. ... [W]hen Discover successfully convinced Wal-Mart in the early '90s to accept its credit cards, Visa's concern about potential volume loss at Wal-Mart led it to offer promotional support to Wal-Mart for the first time.  [In Evans and Schmalensee, *Paying with Plastic*, 132, the establishing of lower interchange fees by Visa and MasterCard to supermarkets is described in more detail.  This activity is clearly illegal price fixing; it establishes merchant discounts for particular merchants for all members of each association which may be accepting or transmitting deposits.  The associations cannot take deposits.]

In *U.S. v. Visa,* 344 F. 3d 229 (2nd Cir. 2003), the Second Circuit concluded:

> p. 235.  Payment requests are sent by the merchant to the acquirer, which forwards the requests to the issuer.  The issuer then pays the acquiring bank the amount requested, less what is called an "interchange" fee – typically 1.4%.  The acquirer retains an additional fee – approximately 2 % of the amount of the transaction from the merchant.  This is known as the "merchant discount."

> p. 239.  Networks [*not banks!*] also compete for merchants, because the price merchants pay for acceptance of payment cards (the merchant discount) is affected by the size of the interchange fee, which is set by the network. [Which is what our case is about.]

> p. 239.  ... issuance and acceptance of credit and charge cards is so profitable (and network service fees so negligible in comparison) that even a large increase in network fees would not provide a rational financial incentive to abandon the business of issuing or accepting payment cards.

> p. 240.  Indeed, despite recent increases in both networks' interchange fees, no merchant had discontinued acceptance of their cards.

7

p.  240.   Testimony at trial revealed that Visa
U.S.A. and MasterCard "pay millions of dollars in
incentive payments in the form of the price for
network services to selected issuing banks to compete
for their business and [that] the banks play Visa and
MasterCard against [each] other to obtain lower net
prices and higher value for card network services."
With only two viable competitors, however, such price
and product competition is necessarily limited.  [This
shows that *NaBanco's* reliance on the freedom of banks
to opt out of the network , 779 F. 2d 594, is no
longer relevant because they can now make a special
deal with an entire network.  What large bank would
make a deal with one or a few banks when it can make a
better deal with a whole network?  Why would any bank
opt out of a consortium which establishes the merchant
discount?]

As this court noted in *Reyn's,* the Court may take judicial
notice of these facts in prior related litigation without
treating a Rule 12(b)(6) motion as one for summary judgment.
*Reyn's*, 259 F. Supp. 2d 997.

### III.   THE BANKS VIOLATE SECTION ONE IN THEIR INDIVIDUAL CAPACITIES BY PARTICIPATING IN THE OWNERSHIP AND MANAGEMENT OF THE ASSOCIATIONS AND APPLYING THE FIXED MERCHANT DISCOUNTS IN ACCEPTING DEPOSITS

Defendant Banks complain (Memo. 4) that under *Monsanto Co. v. Spray-Rite service Corp., 465 U.S. 752, 764* (1984) plaintiff must present evidence that to (1) "exclude the possibility" of independent action by alleged conspirators, and (2) prove that *each* of the alleged conspirators had a "conscious commitment to a common scheme designed to achieve an unlawful objective." What is there about fixing the merchant discounts all the member banks – and others- agree to charge merchants similarly situated that can possibly be legal? Compl. Pars. 8,9,10, 17(b), 21(a), 22, 24, 27-30.  Isn't this a conscious commitment to an illegal practice by each bank?  Can this possibly be consistent with "permissible competition?"   Why is it not sufficient at the pleading stage to aver that each bank has a proprietary interest in and participates in the management of a bankcard network? Defendant Banks ignore the averments in the complaint that where there is competition as in the acceptance of checks for clearing, there is no merchant discount. Pars. 8,9,10, 21(a); see *Reyn's*, 259 F. Supp. 2d 1001.  Again, *U.S. v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D. N.Y. 2001) supplies facts showing the banks' participation is not independent action.

In *U.S. v. Visa* Judge Jones found:

> p. 333. Because the owners of the associations
> are also the customers, and vice versa, the
> associations are necessarily consensus-driven.

In *U. S. v. Visa*, 344 F. 3d 229 (2nd Cir. 2003), the Second
Circuit concluded:

> p. 235.  Visa U.S.A. and MasterCard are organized
> as open joint ventures, owned by the numerous banking
> institutions that are members of the networks.

> p. 235.  The member banks of the MasterCard and
> Visa U.S.A. card networks may function either as
> "issuers" or "acquirers" or both.

> p. 236.  Thus, all Visa cards issued in the
> United States are issued by members of the Visa U.S.A.
> consortium.

> p. 235.  The member banks of the MasterCard and
> Visa U.S.A. card networks may function either as
> "issuers" or "acquirers" or both.

> p. 242.  In denying the networks' argument that
> they were like "single entities", the Court held "they
> are consortiums of competitors.  They are owned and
> effectively operated by some 20,000 banks, which

compete with one another in the issuance of payment

cards *and the acquiring of merchants' transactions*

..." (emphasis added).

The restrictive provision is a horizontal restraint adopted

by most of the competing banks in this country.  How can

Defendant Banks contend that *NaBanco* still has any evidentiary

support?  Especially without mentioning *U.S. v. Visa*?

Next Defendant Banks urge upon the Court, *AD/SAT v.*

*Associated Press,* 181 F. 3d 216 (2d Cir. 1999), which rejected a

finding of concerted action based solely on a defendant's status

as a member of an association; fortunately the Court of Appeals

which rendered *AD/SAT* is the same court which rendered the

decision Defendant Banks do not deign to mention: *U.S. v. Visa*.

In our case, like *U.S. v. Visa*, the members do something

mandated by the associations: each bank individually agrees to

charge an association-established merchant discount on the Visa

and MasterCard deposits they receive.  "In setting interchange

rates paid by merchants to issuers (through the merchants'

acquiring banks), both Visa and MasterCard consider . . ." *U.S.*

*v. Visa*, 163 F. Supp. 2d 337.

Defendant Banks are also in denial when they assert that

*Freeman v. San Diego Association of Realtors,* 322 F. 3d 1133 (9th

Cir. 2003), certiorari den. 540 U.S. 940 (2003), "does not

address the particularized conduct requirement for suing

individual members of a trade association or joint venture."
How can that be?  As we read the opinion, the Court of Appeal
not only reversed a summary judgment in favor of the association
members of Sandicor (the joint venture or trade association) but
granted summary judgment against the members. *Freeman*, 322 F. 3d
1157.  The particularized conduct relied on to hold the members
liable included independent ownership, *Freeman*, 322 F. 3d 1148;
actual or potential competitors, 322 F. 3d 1148-50; members
contracting with customers on their own accounts, 322 F. 3d
1149; no common ownership among members, 322 F. 3d 1149; and no
sharing of profits among members, 322 F. 3d 1149.  Each
Defendant Bank fits that description like a glove.

    We note the similarity between the indirect price-fixing
the Court of Appeals found illegal per se in *Freeman* and the
original setting of "interchange fees" by Visa and MasterCard,
*Freeman*, 322 F. 3d 1146-47.

## IV.  PLAINTIFFS' CLAIM FOR EQUITABLE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT SHOULD NOT BE DISMISSED

    Defendant Banks assert that this Court dismissed this claim
in *Reyn's.* Memo 8.  Wrong.  In *Reyn's* this Court dismissed a
claim under Section 7 of the Clayton Act, not Section 26, *Reyn's*
259 F. Supp. 2d 1003.  The claim under Section 16, 15 U.S.C.A.
26 is different in substance from a claim under Section 4, 15

U.S.C.A. 15(a). *Freeman*, 322 F. 3d 1145-46. See, *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 129-132 (1969).

## V.   CONCLUSION

The foregoing establishes that the facts, upon which *NaBanco* upheld Visa's establishment of the interchange fee, no longer exist.   The associations' market shares are now dominant. The interchange fee is no longer based on a cost reimbursement methodology but on what might best be called a merchant market analysis in which both Visa and MasterCard have market power. All acquiring banks and third party processors charge merchants at least the interchange fee and follow the percentage allocation of the merchant discount.   Neither Visa nor MasterCard can be viewed as a single entity; they are each consortiums of competitors; Defendant Banks are members of the consortiums.

Accordingly, the complaint in this action differs from the amended complaint in *Reyn's* in several respects.   First, this complaint avers that Visa and MasterCard establish merchant discount fees as well as interchange fees. Par. 21(a).   Second the third party processors are included as co-conspirators because they charge the merchants the merchant discount fees established by Visa and MasterCard. Par. 21(a).   *Paying with Plastic,* p. 115, states that in 1997, nonbanks and banks

involved in joint venture with nonbanks controlled 60 percent of the acquiring market when measured by volume.   The networks' fixing of different interchange/merchant discount fees for different classes of merchants and for special merchants would not work if bank members or third party processors could establish a lower discount or none at all.   See, *Freeman* , 322 F. 3d 1146-7 {9th Cir. 2003), discussion of the discount ban and *Catalano v. Target Sales,* 446 U.S. 643, 648 (1980) (per curiam).

In *Reyn's* the Court struck the claim for price discrimination among merchants, citing two cases which held that price discrimination was not an antitrust violation in the absence of conspiracy. 259 F. Supp. 2d 1001.  The two cases relied on by the Court expressly stated that their holdings were based on the absence of evidence of conspiracy. *Zoslaw v. MCA Distrib. Corp.* 693 F. 2d 870, 890 (9th Cir. 1982); *USM Corp. v. SPS Technologies, Inc.,* 694 F. 2d 870, 512-514 (7th Cir. 1982).

Because it is now established that Visa and MasterCard are consortiums of competitors, there is another difference from *Reyn's.*  Plaintiffs have averred that Visa and MasterCard have directly negotiated lower discounts with selected merchants and that in a competitive market member banks of Visa and MasterCard would have offered at least such discounts to plaintiffs and other merchants. Par. 21(b).  Accordingly, Plaintiffs have

14

excluded from the class, which they purport to represent, those merchants who negotiate merchant discounts directly with Visa or MasterCard. Par. 12.

In the Court's tentative ruling in *Reyn's* the Court asked, "... what specific damages will the national plaintiffs be able to seek against the individual banks currently listed as defendants who have accounts with the named California customers?" Plaintiffs' answer is that national plaintiffs can recover the difference between the merchant discount actually charged by whatever their bank of deposit and a competitive discount (zero in the case of checks) from these Defendant Banks, because any member of the consortium of competitors is jointly and severally liable for all the damages. *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 646-7 (1981).

The Court's question bears on the Defendant Banks' complaints that they are only doing what the rest of the banks are doing and that Plaintiffs do not have a contract relationship with a Defendant Bank (Memo. 1-2). Defendant Banks do not understand the nature of a Sherman Act price-fixing violation. They not only charge a fixed price for deposits (the merchant discount), they also do not compete among themselves by offering the equivalent of "free checking". If the three

Defendant Banks would offer merchants free card deposits, the other banks would have to follow suit.  Visa's answer admits that the Defendant Banks are members of Visa (Answ. Pars. 8-10). Why don't Defendant Banks accept MasterCard deposits without charging a discount?  In any event the Supreme Court considered and rejected all methods of apportioning damages among co-conspirators, including sales to a particular plaintiff. *Texas Industries*, 451 U.S. 637.  In 1983 Professor Baxter, Visa's expert in *NaBanco*, had written publicly that banks should compete with respect to the merchant discount. Baxter, "Bank Interchange of Transactional Paper: Legal and Economic Perspectives", *The Journal of Law and Economics*, vol. XXVI (Oct. 1983), p. 541 at 587.  The factual changes from *NaBanco* were perfectly apparent when Judge Jones rendered her opinion in *U.S. v. Visa*.

As a matter of law the question was definitively answered over one hundred years ago – and affirmed 99 years ago – when it was determined that it was "of no vital significance" that a purchaser was suing two members of a price fixing conspiracy for overcharges made on sales by a third member of the conspiracy. *City of Atlanta v. Chattanooga Foundry and Pipe Works*, 127 Fed. 23 (6th Cir. 1903), aff'd. 203 U.S. 390 (1906).  The *Chattanooga* rule was followed in the Cement Cases, *State of Washington v.*

C 04 4276 JSW

*American Pipe & Construction Co.,* 280 F. Supp. 802, 804-805 (W.D. Wash. 1968).

In challenging just one of the banks' fees, the fixed merchant discount, the Plaintiffs are not trying to "get something for nothing". The merchants' deposits are the cheapest money that banks receive that they can loan out at a profit. See, Mishkin, *The Economics of Money, Banking and Financial Markets* 6th ed Update, 2003) p. 213.

Dated:  February 25, 2005

Attorneys of record for
Plaintiffs SHERI L. KENDALL,
dba BALA HAIR SALON, JAMES
MASER, MAIZ HOLDING COMPANY,
dba PICANTE COCINA RESTAURANT,
on Behalf of Themselves and All
Others Similarly Situated


By:_____
    RICHARD J. ARCHER, ESQ.
        ARCHER & HANSON


By:_____
    JAMES A. KOPCKE
    GOLDEN · KOPCKE, LLP

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

C 04 4276 JSW