1    ROBERT J. VIZAS (CA State Bar No. 56187)
     ARNOLD & PORTER LLP
2    90 New Montgomery Street, Suite 600
     San Francisco, CA  94105
3    Telephone: (415) 356-3000
     Facsimile:  (415) 356-3099
4
     M. LAURENCE POPOFSKY (CA State Bar No. 33946)
5    MARIE L. FIALA (CA State Bar No. 79676)
     RUSSELL P. COHEN (CA State Bar No. 213105)
6    RACHEL M. JONES (CA State Bar No. 218642)
     HELLER EHRMAN LLP
7    333 Bush Street
     San Francisco, CA  94104-2878
8    Telephone: (415) 772-6000
     Facsimile:  (415) 772-6268
9

10   Attorneys for Defendant
     VISA U.S.A. INC.
11

12               UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                SAN FRANCISCO DIVISION

| | |
|---|---|
| SHERI L. KENDALL, dba BALA HAIR SALON, JAMES MASER, MAIZ HOLDING COMPANY, dba PICANTE COCINA RESTAURANT, on Behalf of Themselves and All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>VISA U.S.A. INC., MASTERCARD INTERNATIONAL, INC., BANK OF AMERICA, N.A., a subsidiary of BANK OF AMERICA CORPORATION, WELLS FARGO BANK, N.A., a subsidiary of WELLS FARGO & COMPANY, U.S. BANK, N.A., a subsidiary of U.S. BANCORP,<br><br>               Defendants. | Case No.:  C04-4276 JSW<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT VISA U.S.A. INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>**FED. R. CIV. P. 56**<br><br>Date:        July 8, 2005<br>Time:       9:00 a.m.<br>Courtroom:  Two, 17th Floor<br>Honorable Jeffrey S. White |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND FACTS .......................................................................................4

    A.    The Visa System and the Role of Interchange..............................................4

    B.    The *NaBanco* Litigation...............................................................................7

    C.    Visa's Current System Not Only Permits, but Facilitates
         Bilateral Interchange Agreements................................................................8

    D.    Visa Does Not Set Merchant Discount Fees.................................................9

    E.    The *Reyn's* Case........................................................................................10

III.  ARGUMENT .......................................................................................................11

    A.    Summary Judgment Standards.....................................................................11

    B.    Summary Judgment Should Be Granted on the Basis of
         *NaBanco.*.....................................................................................................12

         1.    Adherence to Precedent Is an Important Means of
             Ensuring Consistent and Predictable Application of
             the Law.............................................................................................13

         2.    Interchange Fees Are As "Necessary" to the
             Functioning of Visa's Payment Card System Today As
             at the Time of *NaBanco.*.................................................................14

         3.    As in *NaBanco*, the System Participants Can Opt Out
             of Visa's Default Interchange Fee. ..................................................18

         4.    The Specific Level at Which Interchange Is Set Is Not
             a Relevant Consideration for an Antitrust Court. .............................19

IV.   CONCLUSION ....................................................................................................21

i

# TABLE OF AUTHORITIES

Page

## Cases

*Ally Gargano/MCA Advertising, Inc. v. Cooke Properties, Inc.,*
No. 87 CIV. 7311,
1989 WL 126066 (S.D.N.Y. Oct. 3, 1989) ..............................................14

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 250 (1986) ..................................................................11

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
603 F.2d 263 (2d Cir. 1979)..........................................................20, 21

*Brennan v. Concord, EFS, INc.,*
No. C-04-2676
2005 WL 1081341 (N.D. Cal. May 4, 2005) .....................................16, 20

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,*
441 U.S. 1 (1979)....................................................................12, 15, 16

*Burnet v. Coronado Oil & Gas Co.,*
285 U.S. 393 (1932).........................................................................13

*Business Elecs. Corp. v. Sharp Elecs. Corp.,*
485 U.S. 717 (1988).........................................................................17

*California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc.,*
818 F.2d 1466 (9th Cir. 1987)............................................................11

*Chicago Prof'l Sports, Ltd. P'ship v. NBA,*
95 F.3d 593 (7th Cir. 1996)........................................................12, 20, 21

*City of Mt. Pleasant v. Assoc. Elec. Coop,* Inc.
838, F.2d 268 (8th Cir. 1988).......................................................12, 13

*Columbia Broad. Sys., Inc. v. American Soc'y of Composers, Authors and
Publishers,* 620 F.2d 930 (2d Cir. 1980) ..............................................15

*Continental Airlines, Inc. v. United Airlines, Inc.,*
120 F. Supp. 2d 556 (E.D. Va. 2000) ..................................................14

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
433 U.S. 36 (1977)...........................................................................17

*Dagher v. Saudi Refining Inc.,*
369 F.3d 1108 (9th Cir. 2004)...........................................................16

*Freeman v. San Diego Ass'n of Realtors,*
322 F.3d 1133 (9th Cir. 2003).......................................................12, 14

*Great Clips, Inc. v. Levine,*
  CIV. No. 3-90-211, 1991
  WL 322975(D. Minn. Oct. 9, 1991) ....................................................14

*Illinois Brick Co. v. Illinois,*
  431 U.S. 720 (1977) ............................................................. *passim*

*In re Visa Check/MasterMoney Antitrust Litigation*
  297 F. Supp. 2d 503 (E.D.N.Y. 2003) ...........................................3

*In re Visa Check/MasterMoney Antitrust Litigation*
  396 F.3d 96 (2d Cir. 2005)........................................................3

*International Healthcare Mgmt. v. The Hawaii Coalition for Health, et al.,*
  332 F.3d 600 (9th Cir. 2003)....................................................12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986)..............................................................12

*National Bancard Corp. v. Visa U.S.A. Inc.*
  596 F. Supp. 1231 (S.D. Fla. 1984) ........................................ *passim*

*National Bancard Corp. v. Visa U.S.A. Inc.*
  779 F.2d 592 (11th Cir. 1986)................................................ *passim*

*Orson, Inc. v. Miramax Film Corp.,*
  79 F.3d 1358 (3d Cir. 1996)......................................................17

*Payne v. Tennessee,*
  501 U.S. 808, 827 (1991)........................................................13

*Reyn's Pasta Bella, L.L.C. v. Visa U.S.A. Inc.,*
  259 F. Supp. 2d 992 (N.D. Cal. 2003) ...................................... *passim*

*SCFC ILC, Inc. v. Visa,*
  936 F.2d 1096 (10th Cir. 1991)..........................................4, 14

*State Oil Co. v. Khan,*
  522 U.S. 3 (1997) .................................................................13

*SouthTrust v. Plus Systems Inc.,*
  913 F. Supp. 1517 (N.D.Ala. 1995) ..........................................14

*Town of Concord v. Boston Edison Co.,*
  915 F.2d. 17 (1st Cir. 1990) ...................................................21

*United States v. Engelhard Corp.,*
  126 F.3d 1302 (11th Cir. 1997)................................................14

*United States v. Visa U.S.A., Inc.,*
  163 F. Supp. 2d 322 (S.D.N.Y. 2001).........................4, 9, 16, 17

*Vasquez v. Hillery,*
  474 U.S. 254 (1986) ............................................................13

iii

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004)...............................................................................................20

**Statutes**

Sherman Act, 15 U.S.C. § 1 ................................................................................1, 18

Clayton Act, 15 U.S.C. § 26.......................................................................................19

Fed. R. Civ. P. 56 .........................................................................................................1

**Other Authorities**

3 PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW
    ¶ 720b (2d ed. 2002) ............................................................................................20

William F. Baxter, *Bank Interchange of Transactional Paper:  Legal and
    Economic Perspectives,*
    26 J. of Law and Econ. 541 (1983) ...............................................................19, 20

DAVID EVANS AND RICHARD SCHMALANSEE,
    PAYING WITH PLASTIC:  THE DIGITAL REVOLUTION IN BUYING AND
    BORROWING, (1999)...............................................................................................4

MEMORANDUM OF POINTS AND AUTHORITIES ISO OF VISA U.S.A. INC'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: C04-4276  (JSW)

# I.    INTRODUCTION

The plaintiffs' First Amended Class Action Antitrust Complaint And Demand For Jury Trial ("FAC") alleges that defendant Visa U.S.A. Inc. ("Visa") violates Section 1 of the Sherman Act, 15 U.S.C. § 1, by establishing "fixed" interchange fees that injure merchants who choose to accept Visa-branded payment cards.  Visa hereby moves pursuant to Fed. R. Civ. P. 56 for summary judgment on all claims for relief pleaded in the FAC on the following grounds:[1]

- Plaintiffs challenge the default interchange fees that make it possible for the Visa payment system to function by providing certainty of obligation between the member banks that issue cards to cardholders ("issuers") and the member banks that acquire card charges from merchants ("acquirers").  Plaintiffs' attack on interchange fees that form the core of Visa's payment system is indistinguishable from the claim that was rejected on substantive antitrust grounds in *National Bancard Corp. v. Visa U.S.A. Inc. ("NaBanco I")*, 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd* 779 F.2d 592 (11th Cir. 1986) ("*NaBanco II*"), and should therefore be barred as inconsistent with long-standing precedent.

- In *NaBanco II*, the Eleventh Circuit found that establishing interchange fees at the system level is a functional necessity for the existence and operation of the Visa network itself, and therefore does not constitute unlawful price fixing.  *NaBanco II*, 779 F.2d at 602 ("universality of acceptance — the key element to a national payment system — could not be guaranteed absent prearranged interchange rules";

---

[1] In its March 29, 2005 Order, this Court dismissed the original Complaint ("Original Complaint") against the defendant banks, with leave to amend.  On April 25, 2005, plaintiffs filed the FAC, amending their allegations against Visa and MasterCard as well as against the banks.  Visa separately moves to dismiss the damages claims pleaded in the FAC under Fed. R. Civ. P. 12(b)(6) on the ground that plaintiffs are "indirect purchasers" with respect to Visa's default interchange rate and such claims therefore are barred by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  Visa also moves to dismiss the Third and Fourth Claims for Relief and allegations regarding price differentials because they fail to state a cause of action.  Together, Visa's Motion to Dismiss and Motion for Summary Judgment address all claims for relief pleaded in the FAC.

interchange is "rule establishing a 'necessary' term, without which the system would not function.").

- There have been no material changes in the economic characteristics of the Visa system upon which the Eleventh Circuit's holding was based that should lead to a different result in this case. It is as true today as it was at the time of *NaBanco* that the Visa payment system — accounting for almost $1 trillion in annual sales volume in the United States alone — cannot exist without a system-level, "before-the-fact" agreement among Visa members regarding the terms on which a card-issuing bank will pay for a transaction by one of its cardholders at a merchant enrolled by an acquiring bank. That necessary "before-the-fact" agreement is the default interchange rate established by Visa.

- No viable alternative to a system-level default interchange rate exists. At the time of *NaBanco*, as now, a payment card system that depended upon many millions of bilateral agreements among each of Visa's 14,000 members, instead of on a predetermined interchange rate, would entail such prohibitive transaction costs that the Visa product would not exist.

- Consistency with established precedent is particularly important here, where the very existence of the Visa payment card system, a large and vital segment of the nation's commerce, would be threatened if Visa were repeatedly at risk of being enjoined from setting system-level interchange, with the consequent dismemberment of the Visa network.[2]

In deciding Visa's motion, this Court is not writing on a blank slate. This case is virtually identical to the claims previously alleged in *Reyn's Pasta Bella, L.L.C. v. Visa U.S.A. Inc.* (No. C-02-3003) (N.D. Cal.) ("*Reyn's*"), and is brought by the same attorneys. *See* pp. 10-11, *infra*. Visa brought a Rule 12 motion in *Reyn's*, arguing that *NaBanco*

---

[2] Visa's factual showing in support of this motion consists of the accompanying Declaration of William Sheedy in Support of Visa U.S.A. Inc.'s Motion for Summary Judgment ("Sheedy Decl.").

2

1  provided a complete answer to the *Reyn's* plaintiffs' claims.  Although this Court agreed

2  with Visa that the alleged injury in *Reyn's* was the same as in *NaBanco, see Reyn's Pasta*

3  *Bella, L.L.C.  v. Visa U.S.A. Inc.*, 259 F. Supp. 2d 992, 999 n.2 (N.D. Cal. 2003), the Court

4  viewed one factual issue as precluding dismissal on the pleadings.  *Id.* at 999.  The *Reyn's*

5  plaintiffs had alleged — erroneously, as explained below — that Visa prohibited its

6  members from entering into individually negotiated interchange arrangements in lieu of the

7  Visa system default interchange rate.  On that basis, the Court distinguished *NaBanco* and

8  declined to dismiss the case.  *Id.*  Visa subsequently brought a motion for summary

9  judgment demonstrating as a factual matter that it had never prohibited such bilateral

10  interchange arrangements between its members.  However, *Reyn's* was dismissed in its

11  entirety on other grounds before Visa's motion could be fully briefed or heard.[3]

12       Plaintiffs have eliminated from the FAC the allegation that Visa prohibits its

13  members from entering into individually negotiated interchange arrangements, *see* Original

14  Complaint ¶ 26, and they could not have sustained that assertion consistent with Fed. R.

15  Civ. P. 11.  At all times since at least 1980, Visa has permitted its members to agree to

16  "Bilateral Interchange" arrangements in lieu of the Visa default interchange rate.  *See*

17  Sheedy Decl. ¶ 24.  Thus, the bilateral interchange issue does not distinguish this case from

18  *NaBanco*.  The rationale for the *NaBanco* decision — that an agreement among Visa

19  members regarding a default interchange rate is a functional necessity, without which there

20  would be no Visa system — remains unchanged today, and *NaBanco's* holding therefore

21  should be applied here.

---

24    [3] This Court dismissed *Reyn's* on the ground that it was barred by the release and final
25  judgment in *In re Visa Check/MasterMoney Antitrust Litigation* ("*In re Visa Check*" or "*Wal-Mart*"), 297 F. Supp. 2d 503 (E.D.N.Y. 2003).  The *Reyn's* order of dismissal is presently on appeal
26  to the Ninth Circuit.  The *Reyn's* plaintiffs' appeal in the Second Circuit from the *Wal-Mart* district court's order approving the release and confirming its applicability to the *Reyn's* plaintiffs' claims
27  has been rejected, and *Reyn's* plaintiffs' petition for rehearing and suggestion for rehearing *en banc* was denied by the Second Circuit on March 1, 2005.  *In re Visa Check,* 396 F.3d 96 (2d Cir.
28  2005).

## II.    BACKGROUND FACTS

### A.    The Visa System and the Role of Interchange

Visa is an association of some 14,000 members that have joined together to create a payment card under a common system-wide name.[4]  Sheedy Decl. ¶ 3.  Visa has been treated as a joint venture of its member banks for some purposes, depending on the particular business function that is at issue.[5]  *Reyn's,* 259 F. Supp. 2d at 1000; *NaBanco II,* 779 F.2d at 601; *United States v. Visa,* 163 F. Supp. 2d 322, 332; *see also* FAC ¶ 3.

Visa payment cards are widely used and accepted as payment for goods and services in lieu of cash, checks, or other payment devices.  Sheedy Decl. ¶ 4.  As of 2004, approximately 443 million Visa cards were in circulation in the United States and were accepted at more than 5.6 million locations.  *Id.*  Total U.S. sales volume for 2004 was $956 billion, and in excess of $3 trillion worldwide.  *Id.*  Visa does not issue the card bearing its name, nor does it contract with merchants to accept the card.  *Id.* ¶ 6.  Instead, its member banks compete with one another to issue Visa payment cards (acting as "issuers"), or to acquire transactions from merchants that accept such cards (acting as "acquirers"), or both.  *Id.; see also United States v. Visa,* 163 F. Supp. 2d at 332; *see also* FAC ¶ 25.  Visa makes possible this hugely successful and highly competitive system by providing *at the system level* (1) the Visa brand and logo; (2) the network rules, including interchange; and (3) centralized authorization, clearing and settlement functions.  Sheedy Decl. ¶ 5.  No

---

[4] The context in which Visa operates is described in further detail in the Sheedy Declaration.  It is also the subject of several prior judicial opinions, including *NaBanco II,* 779 F.2d 592; *SCFC ILC, Inc. v. Visa,* 936 F.2d 1096 (10th Cir. 1991); and *United States v. Visa U.S.A., Inc.,* 163 F. Supp. 2d 322 (S.D.N.Y. 2001) ("*United States v. Visa*").  *See also* DAVID EVANS AND RICHARD SCHMALANSEE, PAYING WITH PLASTIC:  THE DIGITAL REVOLUTION IN BUYING AND BORROWING (MIT Press 1999).  The latter text describes the Visa and MasterCard networks' operations, including interchange, in detail.

[5] The antitrust laws recognize that some combinations, including joint ventures such as Visa, are an important means of achieving pro-competitive efficiencies by, for example, eliminating redundancies, obtaining economies of scale, increasing sellers' aggregate output, or providing ready access to inputs.  The courts give these combinations room to make operational decisions without fear that every such decision will subject the venture to antitrust scrutiny.  For that reason, a joint venture may be treated as a horizontal combination of separate entities for some purposes and as a single entity for other purposes.  *See* p.12 n.10, *infra.*

individual Visa member, acting alone, could replicate these functions and, thereby, achieve the benefits of the Visa system as a whole. *Id.*

To understand the system and the need for a default interchange rate, it is helpful to consider a typical payment card transaction. In *Reyn's*, this Court described the process as follows:

> When a customer pays with a payment card, the "acquiring" bank purchases the payment card receipt (or electronic equivalent) from the retailer for the [face] amount of payment less a "merchant discount" fee. Through the Visa or MasterCard system, the acquiring bank then receives reimbursement from the cardholder's "issuing" bank for the purchase price less an "interchange fee" — a preset fee agreed to by all issuing and acquiring banks on the Visa or MasterCard network. The issuing bank then profits by the amount of the interchange fee, while the acquiring bank profits by the amount of the merchant discount less the interchange fee. In a credit card system, the issuing bank rather than the merchant bears the risk of nonpayment by the cardholder.

*Reyn's,* 259 F. Supp. 2d at 996-97 (citing *NaBanco II,* 779 F.2d at 595) (footnote omitted). *See generally,* Sheedy Decl. ¶¶ 8, 17. As the example makes clear, the Visa system is typically a four-party arrangement involving: (1) cardholders who use Visa-branded cards to purchase goods and services; (2) merchants that accept such cards as a form of payment; (3) financial institutions that issue Visa cards to cardholders; and (4) financial institutions that contract with merchants to acquire Visa card transactions. *Id.* ¶ 7.

Certain economic characteristics are inherent in this system. First, for any Visa-branded transaction to take place, there must be both a cardholder who wants to use a card to pay for her purchase *and* a merchant who is willing to accept that card. *Id.* ¶ 9. The more cardholders in the system, the more attractive the system is to merchants. At the same time, the more merchants in the system, the more attractive the card is to cardholders. *Id.* Thus, the demands of both cardholders and merchants for the Visa service must be met or no transaction will take place. *Id.* The Visa system is therefore described as "two-sided" and "interdependent." *Id.* Second, costs necessarily are incurred to produce this interdependent, two-sided product. Those costs exist on (*and are incurred for the benefit of*) both sides of the business. *See, e.g., id.* ¶¶ 16-17. These two essential characteristics are

5

common not only to Visa, but also to proprietary (single entity) systems such as Discover and American Express. *Id.* ¶ 14.

To achieve the interdependent benefits of a large merchant and cardholder base, the Visa system must guarantee that merchants who accept Visa payment cards in accordance with Visa's rules will receive payment for each transaction, and that cardholders' cards will be accepted at all merchants who have agreed to accept that category of cards (*i.e.*, credit or debit). *Id.* ¶ 10. Without these assurances, merchants would not agree to accept Visa cards, and cardholders would choose not to use them. These guarantees lead to a third fundamental characteristic that is unique to an open membership system like Visa. For a Visa transaction to take place, there must be agreement in advance on how much a card issuer will pay for a transaction by one of its cardholders at a merchant enrolled by an acquirer. *Id.* ¶ 12. Absent such a "certainty of obligation," the acquirer would have no way of knowing whether, when, or how much it would be paid by the issuer, and the acquirer therefore would be unable to guarantee payment to its merchants. *Id.* ¶¶ 11-12. Thus, it is only with the establishment of a "before-the-fact" agreement that acquirers could rationally agree to accept Visa card charges from merchants. *Id.* ¶ 11.

Moreover, such advance agreements must be established between all system members in order to ensure that cardholders can use their payment card at any merchant that accepts the card, regardless of the identity of the cardholder's issuer or the merchant's acquirer. *Id.* However, since there are over 14,000 Visa members that issue Visa cards and/or acquire Visa card transactions from merchants, many millions of bilateral negotiations would be required to achieve this result, generating prohibitive transaction costs. *Id.* ¶ 12. Instead, Visa has established the necessary advance agreement at the system level, in the form of default interchange rates. *Id.* Without the default interchange rates to take the place of the millions of individually-negotiated bilateral exchange agreements that would otherwise be required, there would be no Visa payment system at all. *Id.*

1    In addition, without such an advance agreement in the form of the default

2    interchange fee, acquiring banks would be subject to "hold up" problems that would make it

3    impossible for the system to function.  *Id.* ¶ 13.  Critical to understanding this point is the

4    fact that, once an acquirer agrees to take a merchant's receipt, there is no "market" in which

5    to sell it, because the *only* possible "buyer" is the cardholder's issuing bank.  Because

6    acquirers cannot refuse to accept issuers' cards and have no alternative "buyer" for any

7    transaction, issuers would be able to demand increased interchange payments by acquirers,

8    likely resulting in higher merchant discount fees.  *Id.*  Without an advance agreement on a

9    default interchange fee to avoid this "hold up" problem, acquirers and merchants would

10   drop out of the system or attempt to steer customers to other forms of payment.  *Id.*

   **B.     The *NaBanco* Litigation**

12   In the early 1980s, the National Bancard Corporation ("NaBanco") sued Visa,

13   alleging that Visa's interchange fee violated the antitrust laws.  Visa prevailed after an

14   extensive bench trial, and the Eleventh Circuit upheld the district court's holding that the

15   interchange fee did not amount to an unreasonable restraint of trade.  *NaBanco II*, 779 F.2d

16   592.

17   The Eleventh Circuit found that a predetermined interchange fee was essential to the

18   operation of the Visa system.  Because Visa had more than 10,000 members at the time, the

19   court concluded that it is not feasible for each of those participants to reach bilateral

20   agreements with every other member.  *Id.* at 595, 601-02.  Given this inherent impediment,

21   the court held that prearranged system-level interchange fees were a functional necessity to

22   allow the offering of a service that none of the individual members could offer individually

23   — a nearly universally-accepted payment system that is "truly greater than the sum of its

24   parts."  *Id.* at 601-02.  As the court explained:  "[f]or a payment system like Visa to

25   function, rules must govern the interchange of the cardholder's receivable.  The

26   [interchange fees] represent one such rule establishing a 'necessary' term, without which

27   the system would not function."  *Id* at 602.  Consequently, the interchange fee, as an

28

7

essential factor to making the Visa network possible, was lawful under the rule of reason.[6]
*Id.* at 604-05.

At the time of the *NaBanco* trial and decision, Visa had no bylaws or operating regulations that constrained the right of the member banks to fashion whatever bilateral agreements they chose with respect to the price level of interchange. Sheedy Decl. ¶ 24. The Eleventh Circuit thus noted that the system participants could bypass the set interchange fee and negotiate non-default rates if they chose to do so.[7] *NaBanco II,* 779 F.2d. at 600 n.13.

## C. Visa's Current System Not Only Permits, but Facilitates Bilateral Interchange Agreements.

Visa's rules with respect to Bilateral Interchange are the same now as they were at the time of *NaBanco.* Sheedy Decl. ¶ 24. Visa has no by-laws or operating regulations that prevent member banks from entering into Bilateral Interchange agreements.[8] *Id.* Since *NaBanco*, Visa has improved its system capabilities in order to allow Visa's members to customize the interchange rate applicable to any given set of transactions directly through VisaNet. *Id.* ¶¶ 22-32. At the time of *NaBanco*, member banks could adjust the interchange rates only by performing the desired monetary adjustments outside of the

---

[6] As the *NaBanco I* court noted:

> Assuming that VISA cardholders want unplanned and rapid access to merchants anywhere, regardless of whether their own bank signed a particular merchant, and that VISA merchants want unplanned and rapid access to each cardholder who enters their shop, regardless of whether the merchant's bank signed the cardholder, then some before-the-fact agreements must be made.

596 F. Supp. at 1254.

[7] Visa does not believe that the availability of Bilateral Interchange was essential to the holding in *NaBanco* in light of both the district court and the Eleventh Circuit's determination that an interchange fee system was necessary to the existence of the system. However, nothing turns on that issue for present purposes and we, thus, take no issue with that articulation here.

[8] Plaintiffs had alleged in *Reyn's* and in the Original Complaint in this case that Visa's prohibition on "Private Arrangements" meant that members could not opt out of the interchange fees set by Visa. *See Reyn's* Second Amended Complaint ("SAC") ¶ 25; Original Complaint ¶ 26. As Visa explained in its motion for summary judgment in *Reyn's*, that assertion was incorrect and based on a misunderstanding of the rule addressing "Private Arrangements." Plaintiffs have now dropped that erroneous allegation from the FAC.

8

1   VisaNet processing framework.  More recently, Visa has developed infrastructure that

2   allows its member banks to control the interchange rate that VisaNet itself applies to any

3   specified subset of transactions.  *Id.* ¶ 25.  A critical component of this infrastructure is the

4   Merchant Validation Value ("MVV"), which can support select merchant interchange fee

5   programs on any type of Visa card.  *Id.* ¶¶ 30-32.  Member banks can avoid the default

6   VisaNet system interchange rate and effectuate their Bilateral Interchange arrangements

7   directly through VisaNet using the MVV infrastructure.  Parties could agree, for instance,

8   that all transactions between a given acquirer and a given issuer, either generally or on a

9   merchant-specific basis, would have a negotiated interchange rate different from the Visa

10  system-wide default rate.  *Id.*  Visa put in place the system changes necessary to implement

11  the MVV infrastructure as of October 2002, and it remains in place today.  *Id.*

12          **D.      Visa Does Not Set Merchant Discount Fees.**

13          Visa's role in the payment card system, including the setting of default interchange

14  rates, occurs solely at the system level.  Sheedy Decl. ¶ 5; *see also United States v. Visa*,

15  163 F. Supp. 3d at 332 (Visa members "work together [through Visa] to achieve benefits for

16  themselves they could not provide independently including [a] globally recognized brand[]

17  and sophisticated computer network[] for processing transactions").  This is a function that

18  no individual member could provide on its own, and without which members could not

19  compete with each other in issuing cards or acquiring merchants.  Sheedy Decl. ¶¶ 5, 7.

20          Plaintiffs allege in the FAC that Visa sets the interchange fee and that "[m]ost of the

21  merchant discount fee is the interchange rate."[9]  FAC ¶ 11.  Visa does not dispute that

22  ───────────────────────
            [9] Plaintiffs had alleged in the Original Complaint that Visa directly sets the merchant
23  discount fee paid by merchants to their acquirers.  *See, e.g.,* Original Complaint ¶¶ 21(a), 21(b), 26.
    As explained in the text, that is incorrect, and plaintiffs have watered down that allegation in the
24  FAC.  Even where the FAC avers that the merchant discount fee is established "both directly and
    indirectly" by Visa, the context of the allegations makes clear that plaintiffs are alleging that Visa's
25  interchange fees set the minimum, or "floor," for the merchant discount fees.  *See, e.g.,* FAC ¶ 8 ("a
    *minimum* merchant discount fee . . . is established, both directly and indirectly, by the
26  Consortiums") (emphasis added); *id.* ¶ 9 (merchants are charged by acquiring banks "the amount of
    the interchange rate fixed by the Consortiums as the minimum merchant discount fee"); *id.* ¶ 11 ("a
27  merchant discount fee . . . is established, both directly and indirectly, by the Consortiums. Most of
    the merchant discount fee is the interchange rate which is established by the Consortiums.")
28  (citation omitted).

                                                    9

acquirers incur a number of costs, including, *inter alia*, the interchange fees, terminal deployment, risk management, customer service, marketing and sales, and others. Sheedy Decl. ¶ 19. Although acquirers typically would seek to recover all of these costs in the fees they charge to merchants, the extent to which each acquirer passes the interchange fee or any other cost on to merchants is entirely within its discretion. *Id*. ¶ 20. Some acquirers may also choose to bundle the pricing of Visa card acceptance with other merchant banking services. Thus, the merchant discount fee can vary, and may be less than the interchange fee on a per transaction basis. *Id*.

Visa is *not* involved in the individual negotiations between each merchant and its bank over the amount of the merchant discount fees. *Id*. ¶ 18. As a practical matter, Visa could not possibly set these fees or otherwise participate in the many millions of merchant-acquirer relationships. More importantly, there is no reason for it to do so. These individual negotiations are central to the competition between acquirers for merchants. *Id*. ¶ 19. Unlike the default interchange fees — without which the Visa system could not function — there is no reason for merchant discount fees to be set at the system level.

### E.   The *Reyn's* Case

In *Reyn's*, as here, the plaintiffs alleged that Visa, MasterCard and the defendant banks violated the Sherman Act by maintaining artificially high interchange fees on credit and debit card transactions through price fixing and exclusionary conduct, and that such interchange fees, in turn, inflated merchant discounts to supracompetitive levels. *See, e.g., Reyn's* SAC ¶¶ 20(a), 23; *compare* FAC ¶ 25 ("VISA . . . sets an 'interchange fee' which is in effect a minimum merchant discount fee to be paid by merchants"); *id*. ¶ 17 ("The minimum merchant discount fees established by the Consortiums have harmed and continue to harm the interests of retailers, businesses, professions and merchants, including those 'on-line' throughout the United States."). Both cases were brought on behalf of a putative class of all merchants nationwide that accept Visa and/or MasterCard card transactions. *Reyn's* SAC ¶ 11; FAC ¶ 16.

As this Court will recall, Visa moved to dismiss the *Reyn's* First Amended Complaint on the ground that plaintiffs' claim was controlled, and disposed of, by *NaBanco*. The Court cited with approval *NaBanco's* determination that the interchange fee is necessary to the existence of the Visa product, and reiterated *NaBanco's* central finding: "'[U]niversality of acceptance — the key element to a national payment system — could not be guaranteed absent prearranged interchange rules.'" *Reyn's*, 259 F. Supp. 2d at 999 (quoting *NaBanco II*, 779 F.2d at 602). However, one factual allegation — plaintiffs' erroneous claim that Visa no longer permitted member banks to opt out of the default interchange fee and negotiate interchange fees individually — precluded dismissal under *NaBanco*. *See Reyn's*, 259 F. Supp. 2d at 999.

*Reyn's* plaintiffs filed a Second Amended Complaint on May 16, 2003, alleging the same violation of Section 1 and seeking injunctive relief under Section 16 of the Clayton Act. *Reyn's* SAC ¶¶ 11, 19-26, 27-29. Visa moved to dismiss the SAC and simultaneously filed a motion for summary judgment under *NaBanco* asserting that, as in *NaBanco*, Visa did not prohibit its member banks from individually negotiating interchange. Oral argument was heard on the motion to dismiss; the summary judgment motion was taken off calendar pending resolution of the motion to dismiss. Ultimately, the Court dismissed *Reyn's* on the basis of the release and judgment in *In re Visa Check* and Visa's summary judgment motion was never heard nor decided. *See Reyn's*, 259 F. Supp. 2d 992.

## III.   ARGUMENT

### A.   Summary Judgment Standards

Summary judgment puts antitrust plaintiffs to the test, segregating those claims that are worthy of further inquiry from those that are not. To withstand a motion for summary judgment, the non-moving party must show that there are "genuine factual issues that properly can be resolved only by a finder of fact *because they may reasonably be resolved in favor of either party*." *California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)) (emphasis in original). Defendants are entitled to summary

11

judgment on any particular issue where the non-moving party bears the burden of proof, and cannot "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also International Healthcare Mgmt. v. The Hawaii Coalition for Health, et al.*, 332 F.3d 600, 604 (9th Cir. 2003) (summary judgment granted for defendants on Section 1 claims challenging healthcare provider associations' collective negotiation of participating provider agreements, on grounds that no unlawful conspiracy or unreasonable restraint of trade had been established).

**B.     Summary Judgment Should Be Granted on the Basis of *NaBanco*.**

The critical teaching of *NaBanco II* is the necessity of a system-level default interchange fee in order for the Visa payment card product to exist. Such a necessary element of the Visa system, the Eleventh Circuit concluded, is lawful under the antitrust laws. That teaching remains as true today as it was then. Based on Visa's evidence submitted in support of this motion, there can be no genuine dispute that a payment system requiring millions of bilateral interchange agreements among 14,000 issuers and acquirers could not exist. General principles of *stare decisis* hold that subsequent decisions must give deference to prior rulings on the same matters unless there is a compelling basis for a different result. For this same reason, there is no justification for a departure from the long-established and sound conclusions of *NaBanco*.[10]

---

[10] Visa submits that, under applicable antitrust principles, it functions as a single entity with respect to the setting of interchange and, accordingly, that this particular activity is not subject to scrutiny under Section 1. Indeed, the Visa interchange system cannot fairly be viewed as imposing a restraint on competition at all. Rather, it is a necessary device to enable the payment system to function. Put another way, for there to be a restraint on competition, a practice must inhibit competition *that would exist in the absence of that restraint*. *E.g., Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.* ("*BMI*"), 441 U.S. 1, 19-21 (1979). Here, that essential condition is not met, because without the certainty of obligation supplied by Visa's interchange rules, the system itself would not be able to exist. Therefore, such internal decisions by an integrated entity like Visa to establish an interchange fee for its members should not be scrutinized under Section 1 at all. *See Chicago Prof. Sports Ltd. v. NBA*, 95 F.3d 593, 599 (7th Cir. 1996) (sports league has characteristics of both single firm, which would be analyzed only under Section 2, and of concerted activity, which would be subject to Section 1; court analyzed single entity question by focusing on the particular business function at issue); *see also Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1148-49 (9th Cir. 2003) (noting that single entity analysis frequently turns on whether firms "function as an economic unit" in the services at issue); *City of Mt. Pleasant v. Assoc. Elec. Coop*, Inc. 838, F.2d 268, 275 (8th Cir. 1988) (holding that electric

12

### 1.   Adherence to Precedent Is an Important Means of Ensuring Consistent and Predictable Application of the Law.

Courts should adhere to well-established precedent unless there is a compelling legal or factual basis for a departure. This principle — which is a cornerstone of our common law system — lies at the heart of the *stare decisis* doctrine. As the Supreme Court explained in *Vasquez v. Hillery*, 474 U.S. 254 (1986), "*stare decisis* [is] the means by which [courts] ensure that the law will not merely change erratically, but will develop in a principled and intelligent fashion." By permitting "society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, [*stare decisis*] thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact." *Vasquez*, 474 U.S. at 265-66. Although courts can depart from earlier decisions, "the careful observer will discern that any detours from the straight path of *stare decisis* in our past have occurred for articulable reasons, and only when the Court has felt obliged 'to bring its opinions into agreement with experience and with facts newly ascertained.'" *Id.* (quoting *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 412 (1932) (Brandeis, J., dissenting). In the antitrust field, *stare decisis* remains critically important, although courts have observed "a competing interest . . . in recognizing and adapting to changed circumstances and the lessons of accumulated experiences." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). Thus, in *State Oil* the Supreme Court acknowledged that *stare decisis* "'is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process'" (quoting *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)), but it overruled earlier precedent which held that vertical maximum price fixing was a *per se* violation of the Sherman Act. *Id.* at 21.

cooperative was a single entity as to its pricing decisions, because its members were "pursuing a common goal" rather than "independent and conflicting economic interests"). However, it is not necessary for this Court to reach the single entity issue, as *NaBanco* disposes of plaintiffs' claims on their merits without the necessity of any detailed economic inquiry.

13

For these same reasons, deference should be given here to long-established precedent upholding the Visa payment system under the antitrust laws. The alternative would force Visa to operate under a sword of Damocles, facing the continuous threat that its core interchange function might be enjoined, and the system dismantled, whenever an enterprising plaintiffs' attorney chooses to file yet another *NaBanco*-type claim.

### 2. Interchange Fees Are As "Necessary" to the Functioning of Visa's Payment Card System Today As at the Time of *NaBanco*.

Plaintiffs' claims are nearly identical to those litigated in *NaBanco*, in which the Eleventh Circuit, after a full trial, upheld Visa's interchange fees as an essential pro-competitive element of Visa's payment card system.[11]  *See NaBanco II*, 779 F.2d at 605. The Eleventh Circuit's decision, which has been cited frequently with approval by other courts, is supported by ample case law and sound legal and economic analysis.[12]

The legal and economic bases for *NaBanco* are still valid today. As described above, since most Visa cards are issued and merchants are enrolled by different member banks, there must be some mechanism that establishes in advance the respective rights and obligations of these system members amongst themselves, so that they will agree to participate in the systems and play their respective roles (as card issuer or merchant acquirer) knowing in advance the costs, benefits and risks of doing so. The mechanism Visa uses to apportion these costs, benefits and risks among system members is the interchange system. *See, supra*, pp. 3-6. Absent the "certainty of obligation" between an

---

[11] Plaintiffs have now pleaded separate claims relating to Visa credit (First Claim for Relief) and debit (Second Claim for Relief) card transactions. *See* FAC ¶¶ 24-30, 31-32. But, as explained in the text, the necessity of a system-level interchange rate applies equally to debit and credit transactions, and pleading credit and debit as separate counts adds nothing.

[12] *NaBanco* has been cited with approval, not only in payment systems cases, *see SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 965 (10th Cir. 1994) and *SouthTrust Corp. v. Plus System, Inc.*, 913 F. Supp. 1517, 1523 (N.D. Ala. 1995), but also in many other contexts. *See, e.g., Freeman*, 322 F.3d at 1151; *United States v. Engelhard Corp.*, 126 F.3d 1302, 1305 (11th Cir. 1997); *Continental Airlines, Inc. v. United Airlines, Inc.*, 120 F. Supp. 2d 556, 565 (E.D. Va. 2000); *Great Clips, Inc. v. Levine*, CIV. No. 3-90-211, 1991 WL 322975, at *7 (D. Minn. Oct. 9, 1991); *Ally Gargano/MCA Advertising, Inc. v. Cooke Properties, Inc.*, No. 87 CIV. 7311, 1989 WL 126066, at *20 (S.D.N.Y. Oct. 3, 1989). To our knowledge, *NaBanco*'s holding has not been questioned by any court.

issuing bank and an acquiring bank that a system-level interchange fee provides, an acquirer could not possibly agree to guarantee payment to its merchant client for the transaction. That is because, in economic terms, a cardholder's issuing bank enjoys perfect monopsony power (being "the only buyer in town") over an acquiring bank for any particular transaction between that cardholder and a merchant signed by that acquirer. Through a system-level interchange fee, this monopsony power is controlled by the network. *See, supra,* pp. 3-6.

Because Visa's membership — both at the time of *NaBanco* and now — includes many thousands of issuers and acquirers, in the absence of a system-level default interchange fee, each acquirer would have to negotiate with each issuer over the terms of every transaction. *NaBanco II,* 779 F.2d at 596, 605. The impediments of a system based on individual negotiations are obvious. As the *NaBanco* court observed: "individual price negotiations" would be "impractical, would produce instability and higher fees, and could result in the demise of the product offered." *Id.* at 605; *compare* Sheedy Decl. ¶ 12 ("The costs of negotiating millions of bilateral agreements would be prohibitive and, as a consequence, they likely would not exist."). *See also Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.* ("*BMI*"), 441 U.S. 1, 22 (1979) (noting that the use of a blanket license "allows the licensee immediate use of covered compositions, without the delay of prior individual negotiations").[13]

---

[13] The Supreme Court's decision in *BMI*, addressing a joint venture raising obvious parallels with the interchange system, was critical to the result in *NaBanco*, and remains the leading case analyzing horizontal restraints. In *BMI*, the defendant had created a "blanket license" of copyrighted works by which it set a single price for licenses to the works of otherwise competing copyright owners. *BMI*, 441 U.S. at 5. The Court explained that this blanket license created a market for copyrighted works where none had existed before; and that with thousands of owners and thousands of users, a system that required each user to negotiate with each copyright owner prior to use of that owner's works would be inefficient and largely unworkable. *Id.* at 21-23. The Court concluded that the existence of an established price for the blanket license was necessary to the efficient functioning of this marketplace; indeed, the market would not exist, or would be much less robust, without the pricing agreement. *Id.* at 22-23. As a result, the Supreme Court reversed the holding that BMI's business model constituted a *per se* violation of the antitrust laws, and remanded to the Second Circuit, which upheld the practice under the rule of reason. *Columbia Broad. Sys., Inc. v. American Soc'y of Composers, Authors and Publishers,* 620 F.2d 930 (2d Cir. 1980).

15

1    Given these obstacles to establishing a system based on individual agreements, the

2    *NaBanco* court concluded that, "[f]or a payment system like Visa to function, rules must

3    govern the interchange of the cardholder's receivable. The [interchange fees] represent one

4    such rule establishing a 'necessary' term, without which the system would not function."

5    *NaBanco II*, 779 F.2d at 602. That conclusion remains equally true today. There is no

6    practical alternative to a default interchange rate that would allow the Visa payment card

7    system to exist and Visa card transactions to take place.[14] Sheedy Decl. ¶¶ 5, 12.

8        Some perspective is supplied by the practices of the American Express and Discover,

9    which are not associations, but single entity, proprietary firms that do their own issuing and

10   merchant-signing. *Id.* ¶ 14; *United States v. Visa*, 163 F. Supp. 2d at 333. Thus, they have

11   no interchange fee because there is nothing to interchange. They do, however, face

12   precisely the same interdependent two-sided demand by cardholders and merchants, and

13   have the same need to "price" their service in a way that satisfies both "sides" regardless of

14   who is "responsible" for what costs and risks. Sheedy Decl. ¶ 14. As a result, American

15   Express has adopted a system that on average actually charges merchants *more* than they

16   ─────────────────────────

17   [14] Although plaintiffs do not state whether their claim should be analyzed as a *per se* violation or under the rule of reason, the latter is surely correct, and this Court so held in the *Reyn's* case. *Reyn's*, 259 F. Supp. 2d at 1000. *See also BMI*, 441 U.S. at 9, 19-24; *NaBanco II*, 779 F.2 at

18   601-03; *Brennan v. Concord EFS, Inc.*, No. C-04-2676, 2005 WL 1081341 (N.D. Cal. May 4, 2005) ("Horizontal restraints in the context of a procompetitive joint venture remain unlawful per

19   se *unless they are necessary to (or, in certain formulations, 'reasonably ancillary to') the achievement of the joint venture's procompetitive benefits*.") (emphasis added). The Ninth Circuit's

20   recent decision in *Dagher v. Saudi Refining Inc.*, 369 F.3d 1108 (9th Cir. 2004), *petition for cert. filed* (U.S. December 15, 2004), does not alter that conclusion. (On May 26, 2005, the Solicitor

21   General, at the request of the Supreme Court, filed a brief expressing its view that certiorari should be granted and the judgment of the Ninth Circuit reversed.) Visa submits that the *Dagher* panel's

22   decision to subject a distribution and marketing joint venture's pricing arrangement to *per se* liability was misguided and contrary to established legal and economic principles. In addition,

23   *Dagher* is clearly distinguishable from this case on several bases. First, the joint venturers in *Dagher* previously competed with each other selling the same product — gasoline — as that sold

24   by the venture. *Id.* at 1111. That is not the case here: the Visa payment system could not and did not exist without the joint venture. Second, *Dagher* involved allegations of a fixed price for the

25   joint venture's output to consumers external to the venture. *Id.* at 1112. Interchange, instead, is an allocation of costs and revenues to equilibrate the issuing and acquiring sides of the network only

26   among joint venture members. The member banks compete in pricing their payment card products to consumers and merchants. Finally, in contrast with *NaBanco* and the situation here, the *Dagher*

27   court found that the restraint at issue was not reasonably necessary to the joint venture's legitimate aims. *Id.* at 1121. For these reasons, *Dagher* does not require this Court to re-visit its earlier

28   decision in *Reyn's* to apply the rule of reason.

MEMORANDUM OF POINTS AND AUTHORITIES ISO VISA U.S.A. INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: C04-4276 JSW

1 pay to accept Visa. By contrast, Discover — a smaller system — charges somewhat less.

2 *Id.*; *see also United States v. Visa*, 163 F. Supp. 2d at 333. To repeat, a "fixed" interchange

3 fee is simply the mechanism by which Visa — as contrasted with such proprietary systems

4 — balances the dual demands of merchants and cardholders in order to produce products

5 that are competitive in a payment system world. It poses no more of an antitrust issue than

6 do the internal pricing decisions of single entities, like American Express or Discover, that

7 compete in two-sided markets.

8        Plaintiffs can prove nothing that would justify re-visiting the legality of a system that

9 has operated efficiently for over 30 years and that plays a critical role in the nation's

10 economy.[15] Interchange literally enables the Visa system to exist, and thus creates

11 competition among issuers for cardholders and acquirers for merchants, as well as

12 competition between Visa, MasterCard, American Express, Discover, checks, cash and

13 other payment mechanisms. Courts have recognized that arrangements that foster

14 competition, including competition by one brand with others (*i.e.*, "interbrand"

15 competition), are favored under the antitrust laws. *Continental T.V., Inc. v. GTE Sylvania*

16 *Inc.*, 433 U.S. 36, 51-52, 54 (1977); *see also Business Elecs. Corp. v. Sharp Elecs. Corp.*,

17 485 U.S. 717, 724-26 (1988); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1372 (3d

18 Cir. 1996).[16]

19 ─────────────────

[15] In *NaBanco II*, the Eleventh Circuit noted, without discussing, the district court's finding
20 that Visa's interchange fee was "reasonably cost related." 779 F.2d at 603. Anticipating this
motion, plaintiffs attempt to distinguish *NaBanco II* on the basis of changes they assert have taken
21 place in Visa's interchange calculation methodology since that decision. *See* FAC ¶ 13. But such
changes do not call into doubt the core rationale upon which the *NaBanco* holding was based: the
22 necessity of system-level interchange to the existence of the Visa payment system. While the
methodology for calculating the interchange fee has changed over time, it still retains its essential
23 function of optimizing the Visa system by encouraging as many merchants and cardholders as
possible respectively to accept and use Visa cards. Sheedy Decl. ¶¶ 15-16. Subsequent changes in
24 the calculation methodology have no bearing at all on *NaBanco's* essential "necessity" finding and,
in any event, the antitrust laws are not concerned with regulating such pricing decisions. *See* pp.
25 18-19, *supra*.

26    [16] As an illustration, without a default interchange fee, as a practical matter new members
would be unable to enter the system as issuers and/or acquirers because of the necessity of reaching
27 "before-the-fact" agreements with the many thousands of other member banks. The interchange fee
thus makes it possible for financial institutions to compete in issuing cards and acquiring
28 merchants.

Visa respectfully submits that, on the basis of *NaBanco*, this Court should hold that the interchange rate is lawful under the rule of reason, and summary judgment should be granted on plaintiffs' claims.[17]

### 3. As in *NaBanco*, the System Participants Can Opt Out of Visa's Default Interchange Fee.

The sole factual issue that this Court found potentially distinguished the *Reyn's* case from *NaBanco* — "[t]he ability of member banks to bypass the present [interchange] fees," 259 F. Supp. 2d at 999 — is no longer contested by plaintiffs. *See* Original Complaint ¶ 26. Visa's rules governing Bilateral Interchange are the same today as they were two decades ago: member banks are free to agree amongst themselves on whatever interchange rate they choose and may even do so with respect to the rate that will be applied to specific merchant transactions. Sheedy Decl. ¶¶ 23-25. Most importantly for this motion, the rules in this regard have not changed since the time of the *NaBanco* decision.[18] *See id.* ¶ 24.

---

[17] Plaintiffs have pleaded a new claim predicated on Visa's alleged direct negotiation of lower interchange fees with certain large merchants (Third Claim for Relief). But these allegations do not establish a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (*see* Visa's Motion to Dismiss filed herewith), nor do they call into question the applicability of the holding in *NaBanco*. Visa works directly with merchants to further acceptance of Visa products. In recent years, Visa has made significant investments in formulating strategies and implementing marketplace programs with merchants and member banks to help to promote the acceptance of Visa payment cards. Such promotional programs may include payments to merchants based on their meeting certain volume or other criteria. Sheedy Decl. ¶ 21. Although these promotional programs may reduce the effective aggregate amount paid by a merchant for a Visa transaction, they do not involve Visa setting or reducing the merchant discount fees that merchants negotiate with and pay to their acquirers. *Id.* In any event, Visa's efforts to promote the acceptance of Visa payments cards among certain merchants has no bearing on the core rationale of *NaBanco*. And, since plaintiffs have excluded "those merchants who negotiate merchant discounts directly with VISA and/or MASTERCARD or receive payments directly from them" from the class in this case, FAC ¶ 16, plaintiffs can assert no cause of action on behalf of these class members. Visa therefore is entitled to summary judgment on this claim.

[18] It may well be that relatively few members choose to negotiate individual interchange arrangements. If true, that result would not be surprising. Since both parties to such a negotiation would be aware of the system-level default interchange rate, acquirers typically would have no incentive to agree to pay *more* than the default rate, and issuers would have no incentive to agree to accept *less* than that rate. Bilateral arrangements therefore will occur only where such an agreement affords the parties some collateral benefit, such as, *e.g.*, a merchant-specific promotional program. *See, e.g.,* Sheedy Decl. ¶ 30 (describing bilateral interchange arrangement negotiated between a bank and a hotel merchant, to be applied whenever a co-branded Visa card issued by the bank is used at the hotel's locations).

18

1   In fact, it is now far easier for members to effect Bilateral Interchange than it was at

2   the time of *NaBanco*. Visa has modified its computer system so that members can control

3   directly the interchange rate that VisaNet applies to any specified set of transactions. *Id.*

4   ¶ 26. Now, in order to effect a Bilateral Interchange agreement, two Visa members can

5   simply use the MVV infrastructure to adjust the rate directly, using VisaNet. *See id.* ¶¶ 30-

6   32. Of course, those members alternatively could simply cut checks to one another, or use

7   similar methods to adjust the effective interchange rates, outside of Visa's computer system.

8   Visa would be unaware of such arrangements. *Id.* ¶ 28. In short, there is no meaningful

9   way of distinguishing plaintiffs' claims from those adjudicated by the Eleventh Circuit in

10  *NaBanco II.*[19]

11         **4.     The Specific Level at Which Interchange Is Set Is Not a Relevant
                    Consideration for an Antitrust Court.**

12

13         Plaintiffs appear to allege that the fact that the Visa system has a positive interchange

14  when compared with checks, *i.e.*, an interchange which is other than zero, is suggestive of a

15  Section 1 violation. *See, e.g.,* FAC ¶ 8 ("Normally . . . member banks of VISA and

16  MASTERCARD do not charge a fee, or charge a much lower fee, when they buy (accept)

17  checks from their retail customers for deposit in the bank customer's commercial

18  account."); *id.* ¶ 26. Plaintiffs' allegations imply that, absent the agreed interchange fees, a

19  near-"zero" (or "par") result would be reached through "free competition." Although

20  nothing turns on that allegation for purposes of this motion, that assertion is surely wrong.

21  As a matter of economics, competition cannot serve as a substitute for the interchange

22  between acquirer and issuer, a relationship in which there is only one buyer/issuer for each

23  transaction with a particular seller/acquirer. *See* Sheedy Decl. ¶ 13. The *only* practicable

24  alternative to network-mandated fees is regulation (presumably by Congress). In that

25  regard, note that checks exchange at par *because the Federal Reserve Board mandates it.*

26         [19] In their Fourth Claim for Relief, plaintiffs assert a claim under Section 16 of the Clayton
    Act, 15 U.S.C. § 26. But that section does not provide an independent basis for relief. *See* Visa's
27  Motion to Dismiss filed herewith. Accordingly, judgment on plaintiffs' Section 1 claims on the
    basis of *NaBanco* would also be dispositive of the Fourth Claim for Relief. *See* Order Granting
28  Bank Defendants' Motion to Dismiss With Leave to Amend, March 29, 2005.

1    *See, e.g.*, William F. Baxter, *Bank Interchange of Transactional Paper: Legal and*

2    *Economic Perspectives*, 26 J. of Law and Econ. 541, 569-70 (1983).

3        Regulating the level at which Visa sets interchange rates is not an appropriate role

4    for this Court in the context of this private antitrust suit.  As courts and commentators have

5    cautioned, "judicial oversight of pricing policies would place the courts in a role akin to that

6    of a public regulatory commission.   We would be wise to decline that function unless

7    Congress clearly bestows it upon us."  *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d

8    263, 294 (2d Cir. 1979) (internal citation omitted); *see also Verizon Communications Inc. v.*

9    *Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 414-15 (2004) (court should not

10    "assume the day-to-day controls characteristic of a regulatory agency") (quoting Areeda, 58

11    Antitrust L. J., at 853); *Chicago Prof'l Sports*, 95 F.3d at 597 ("[T]he antitrust laws do not

12    deputize district judges as one-man regulatory agencies."); 3 PHILLIP AREEDA & HERBERT

13    HOVENKAMP, ANTITRUST LAW ("AREEDA") ¶ 720b, at 258 (2d ed. 2002) ("The courts

14    correctly regard as uncongenial and foreign to the Sherman Act the burden of continuously

15    supervising economic performance, particularly the firm's day-to-day pricing decisions.").

16        Moreover, as courts have emphasized in recent years, the antitrust laws are not

17    concerned with the *level* of a price once it has been determined that the price was legally

18    established.  In a recent decision in *Brennan v. Concord EFS, Inc.*, No. C-04-2676, 2005

19    WL 1081341 (N.D. Cal. May 4, 2005), Chief Judge Vaughn Walker of this District drew a

20    clear distinction between an antitrust challenge based on the *level* at which the challenged

21    ATM interchange fees are set and an attack on the *agreement* itself to set such fees, holding

22    that the former is not an issue at all under the antitrust laws because "it amounts to a dispute

23    over prices and competition law is not concerned with setting a proper price."  *Id.* at *4.[20]

24    *See also Chicago Prof. Sports L.P.,* 95 F. 3d at 597 ("A high price is not itself a violation of

25

_____

26    [20] *Brennan* came before the court on a motion to dismiss.  The court held that, without
evidence, it could not address the defendants' "intrinsically factual" argument that ATM

27    interchange fees are "necessary" to the existence of the joint venture, and whether such fees should
be assessed under the rule of reason. No. C-04-2676, 2005 WL 1081341, * 6-7.  By contrast, Visa

28    has come forward with such evidence in support of this motion.

the Sherman Act"); *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 25 (1st Cir. 1990) ("[H]ow is a judge or jury to determine a 'fair price?'"); *Berkey Photo*, 603 F.2d at 294 ("Setting a high price may be a use of monopoly power but it is not in itself anticompetitive.").

As these authorities demonstrate, this Court need not — nor should it — engage in the type of pricing analysis suggested by plaintiffs in this case in order to determine the issues presented by this motion.

## IV.   CONCLUSION

For all these reasons, Visa respectfully submits that its motion for summary judgment should be granted.

DATED:  June 3, 2005                    Respectfully submitted,

                                                HELLER EHRMAN LLP

                                                By  s/Marie L. Fiala
                                                     Marie L. Fiala
                                                     Attorneys for Defendant
                                                     VISA U.S.A. INC.

MEMORANDUM OF POINTS AND AUTHORITIES ISO VISA U.S.A. INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: C04-4276 JSW